UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| FIRESTAR ENERGY RESOURCES, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | No. 6:23-CV-162-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| WESTROCK MWV, LLC, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**\*\*\* \*\*\* \*\*\* \*\*\***

Firestar, a coal supplier, secures, sells, and delivers third party coal to its customers. WestRock, a paper company, sometimes burns coal to run its Virginia paper mill. The two companies signed coal supply agreements in 2022 and 2023. The 2022 agreement ostensibly proceeded as expected at the time. But four months into the 2023 agreement, after contracting to purchase a minimum of 215,000 tons of coal during calendar year 2023, WestRock began cancelling Firestar's trains. Firestar then brought this action for WestRock's alleged breach of contract. WestRock counterclaimed, mainly asserting that Firestar breached its own contractual obligations by failing to maintain binding upstream supply commitments from approved origin mines, thereby excusing any breach by WestRock. The parties cross moved for summary judgment on several of WestRock's counterclaims, and Firestar later filed a second motion for summary judgment as to three specific counterclaims. At bottom, the parties' breach of contract allegations all turn on whether Firestar breached its coal sourcing warranties, and if it did, whether those breaches were material. The latter is a fact issue under Kentucky law. So, the Court **DENIES** summary judgment on all breach-related claims. But WestRock's fraudulent inducement claims are not cognizable in this contract setting, as postured, and its unjust enrichment claim depends on

1

the recission sought in its 2023 fraud claim, so the Court **GRANTS** summary judgment in Firestar's favor on Counts IV, V, and VII of WestRock's second amended counterclaim. The Court will schedule a trial in the case.

### I.    Background

Plaintiff and counter-defendant, Firestar Energy Resources, LLC, is a coal brokering company headquartered in Eastern Kentucky. Owned by two brothers, the company purchases coal from various mines and other third-party sources, processes the coal at its affiliated loadout facility, and delivers the sourced coal to its customers, typically at the loadout by train. *See* DE 88-4 at 2–3.

Defendant and counter-plaintiff, WestRock MWV, LLC, is a national paper and packing company. *See* DE 45 at 2–3. WestRock maintains a paper mill located in Covington, Virginia. *See id.* at 3. To fuel its mill operations, WestRock often burns coal in its boilers to produce electricity.

The parties' business relationship began in 2017. *See* DE 88-4 at 3. At that time, WestRock contracted with a third-party coal broker, Coal Network, to source and purchase coal for the Covington mill. *See id.* Throughout 2017–2022, Coal Network entered into separate agreements with Firestar, which committed Firestar to supply coal to Coal Network for eventual delivery to WestRock. *See id.* WestRock and Firestar never directly contracted during this period. *See id.*

In June 2022, after several years of indirect dealing through Coal Network, Firestar and WestRock entered directly into a coal supply contract. The contract, called a "Confirmation" by the parties, committed Firestar to provide, and WestRock to purchase, between 120,000–130,000 tons of coal at $127.50 per ton for the period between June 6, 2022, and December 31, 2022. *See* DE 83-1 at 1. The 2022 Confirmation committed Firestar to sell and ship coal originating from the "Approved Source," absent an approved substitute, which the Confirmation defined as "Seller's

Tackett Creek mine delivered at the Resource Loadout located in Resource, KY with the CSX Origin number 44655." *Id.* at 1, 8. Delivery was to be made "FOB Railcar at the Approved Source," on a monthly schedule and in quantities agreed to by the parties the month preceding delivery. *See id.* at 2, 5. The 2022 Confirmation also established rejection limits for various coal attributes, including calorific value, sulfur percentage, and ash percentage. *See id.* at 2. The defined Specifications ruled acceptable coal quality.

The 2022 Confirmation included certain warranties relating to the Approved Source. Under Section 9 of the Terms and Conditions, Firestar represented and warranted that it "owns, leases or has binding contractual supply commitments from and authority to sell the Coal from the Approved Source," that it "shall continue to own, lease, or have contractually committed to it the Approved Source" during the term of the Confirmation, and that "the Approved Source contains economically recoverable coal of a quality and in quantities that, under present mining laws and practices, shall be sufficient to satisfy the requirements of this Contract[.]" *See* DE 83-1 at 8 (2022 Confirmation § 9(i)-(iii)).

Though Firestar provided, and WestRock accepted, all the contractual supply of coal required by the 2022 Confirmation, the source of that coal now is the subject of dispute. The Confirmation named, as part of the "Approved Source" definition, "Seller's Tackett Creek mine." *See id.* at 1. But Firestar supplied the 2022 Confirmation coal by blending coal from two other sources—Old House mine and Copper Ridge Mining—to fulfill the Contract. *See* DE 83-6 at 9. Indeed, Tackett Creek coal did not feature in deliveries made pursuant to the 2022 Confirmation. *See id.*; DE 85-1 at 13.

Rather, Firestar sourced much of the coal for the 2022 deliveries from the "spot" market— a series of short-term agreements, entered into by Firestar with various mines and suppliers on a

periodic basis. *See* DE 85-1 at 19; DE 85-2 at 31. The agreements were often oral, sometimes memorialized through text messages, with a duration requirement less than the period of the Confirmation. *See* DE 85-2 at 30–31. As to the 2022 Confirmation, Firestar primarily purchased coal from Old House mine, through oral agreements that functionally lasted between two and four months. *See* DE 85-1 at 19.

With the 2022 Confirmation ongoing, the parties, in August 2022, entered into a separate supply agreement for 2023. Under the 2023 Confirmation, Firestar agreed to supply, and WestRock agreed to purchase, between 215,000–230,000 tons of coal during calendar year 2023 at $175.00 per ton, "FOB Railcar at the Approved Source[.]" *See* DE 83-2 at 2. The 2023 Confirmation defined the "Approved Source" differently from the 2022 Confirmation, with 2023 designating "Firestar Energy/Old House Mining delivered at the Resource Loadout located in Resource, KY on CSX rail line[.]" *See id.* The newer agreement otherwise incorporated all Terms and Conditions from the 2022 Confirmation. *See id.* at 3.

Coal deliveries from the 2023 Confirmation proceeded as expected between January and April of 2023, with Firestar delivering and WestRock accepting 67,500 tons of coal. *See* DE 24 at 4; DE 83 at 10. However, in May 2023, WestRock began cancelling Firestar's orders. *See* DE 87-4 at 3. WestRock did not accept any coal between mid-April and early August 2023. *See id.* It accepted five trains between late August and October 2023 but accepted none for the remainder of the year. *See id.* In the end, WestRock ultimately only purchased 106,000 tons of the 215,000 minimum established by the 2023 Confirmation. *See id.* at 1. That action, or inaction, catalyzed this suit.

The supply origin for the 106,000 tons of coal provided in 2023 is similarly at issue. The 2023 Confirmation listed the "Approved Source" as "Firestar Energy/Old House Mining delivered

at the Resource Loadout located in Resource, KY on CSX rail line[.]" *See* DE 83-2 at 2. For deliveries made pursuant to the 2023 Confirmation, "[a]pproximately half of the coal shipped to WestRock came from the Old House mine. Firestar blended Old House mine coal with Ridgeline coal in order to meet WestRock's specifications." *See* 83-6 at 8.

Firestar also utilized the spot market to supply what coal WestRock accepted for the 2023 Confirmation. *See* DE 85-2 at 17. Through verbal and handshake agreements, lasting, e.g., between three to six months, Firestar purchased coal to fulfill its delivery obligations to WestRock. *See id.* The agreements did not cover the entire 2023 calendar year, lacked exact tonnage requirements, and had no associated cancellation penalties. *See id.* at 15–18.

Facing a shortfall in tonnage purchases for calendar year 2023, Firestar instituted this suit. *See* DE 1. It brought a single declaratory judgment claim seeking the Court's declaration that WestRock materially breached its contractual obligations under the 2023 Confirmation. *See id.* at 5.  It later amended the complaint, adding two breach of contract claims, each seeking damages for the difference between the market price and contract price for the unaccepted coal, up to the 215,000-ton minimum. *See* DE 24 at 6–7.

WestRock answered, denying each of Firestar's amended claims. *See* DE 25 at 7–9. Additionally, it brought six counterclaims centered on the 2023 Confirmation, including two breach of contract claims, a material misrepresentation claim, a fraud in the inducement claim, an unjust enrichment claim, and a claim for declaratory judgment. *See id.* at 21–30. It later amended its counterclaims a second time, adding a second fraud in the inducement claim relating to the 2022 Confirmation. *See* DE 45 at 34. The Counterclaims generally address Firestar's procurement of (or contracting for) the coal used to fulfill the 2022 and 2023 Confirmations, alleging that Firestar's practice of obtaining coal from mines other than those listed as the Approved Source

5

amounted to a contractual breach and established misrepresentations in the Section 9 warranties. *See id.*

The parties proceeded to discovery. *See* DE 35. WestRock first moved for partial summary judgment on its breach of contract counterclaims, its fraud in the inducement counterclaims, its material misrepresentation counterclaim, and its declaratory judgment counterclaim. *See* DE 83; 85 (unredacted version). Firestar responded in opposition, *see* DE 87, and separately moved for summary judgment in its favor on each of WestRock's counterclaims. *See* DE 86; 88 (memo in support). Firestar later moved again for summary judgment, after discovery closed, asserting additional bases for the Court to grant summary judgment in its favor on WestRock's fraud in the inducement claims and its unjust enrichment claim. *See* DE 106. WestRock responded in opposition. *See* DE 107. All motions are now ripe for review.

## II.    Standard

Summary judgment is appropriate, under Rule 56, if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the Court may not "weigh evidence [or] determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *See id.* However, "Rule 56(c) mandates the entry of summary

judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Then, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co.*, 88 S. Ct. 1575, 1592 (1968)).

The standard for cross-motions for summary judgment "does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). Thus, when assessing cross-motions for summary judgment, the Court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Sitting in diversity jurisdiction, the Court looks to federal law to resolve procedural issues, and Kentucky law, as the forum state, to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins,* 58 S. Ct. 817, 822 (1938).

### III.    Analysis[1]

The bulk of the parties' summary judgment motions depends on two questions: (1) whether Firestar breached its contractual obligations by failing to have binding supply commitments and thus obtaining coal from sources other than the listed "Approved Source," and (2) if so, whether the breach was material, thereby excusing WestRock of its minimum tonnage obligations under the 2023 Confirmation (and likewise, 2022 Confirmation). The Court takes each in turn.

#### a.  Firestar's Alleged Breaches

The initial question is whether Firestar breached its contractual obligations in sourcing coal from the spot market for delivery to WestRock.[2] WestRock asserts that this practice violated Section 9 of the Terms and Conditions twice over: first, because Firestar delivered coal from a substitute source without WestRock's permission, and second, because Firestar failed to secure

---

[1] The suit and the parties' contracts call for a brief choice of laws analysis. The 2022 Confirmation—and through incorporation the 2023 Confirmation—states that New York law governs the contract. *See* DE 83-1 at 10. It isn't that simple, though. A federal court sitting in diversity jurisdiction applies the choice of law rules of the state in which it sits. *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017). Kentucky courts apply § 188 of the Restatement (Second) of Conflict of Laws (1971) to resolve choice of law issues that arise in contract disputes. *See State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013). This is true even when there's an express choice-of-law provision included in the contract. *See Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 566–67 (Ky. 2012). The Restatement directs courts to apply the law of the state that has the "most significant relationship to the transaction" at issue, considering factors such as the place of contract, the place of performance, the location of the contract's subject matter, and the place of business of the parties. *See State Farm*, 413 S.W.3d at 878 (citing Restatement (Second) Conflict of Laws § 188(1) (1971)). Consulting these factors, the Court is satisfied that the Kentucky Supreme Court would apply Kentucky law. Plainly, this contract has nothing at all to do with New York. The parties' places of business are Georgia and Kentucky; the parties executed the contract in Kentucky, with Firestar representatives twice signing WestRock's drafted confirmations; and a substantial amount of the contract performance took place in Kentucky, with coal sourcing often occurring in the state and train shipments originating from Firestar's Manchester, Kentucky, loadout. The parties do not materially disagree with the analysis, both stating that New York and Kentucky law call for the same result on key issues and briefing their motions comparatively from each state. *See* DE 83 at 10; DE 87 at 3. The Court, hewing to § 188(1) principles, as a Kentucky court would, now resolves the matter in favor of Kentucky law, where *lex fori* typically rules the day.

[2] The Court realizes the nuances on which of the Section 9 warranties technically is at issue in the briefing, but sourcing of Coal is bound up in the existence *vel non* of accurate supply contract representations, so the Court reduces the focus to the essence of those warranties.

and maintain binding upstream coal supply agreements for sufficient quantities for the duration of the 2023 Confirmation. *See* DE 85 at 12–20.

### i. Approved Source

WestRock's first alleged breach depends on the interpretation of "Approved Source." Both Confirmations link contractual obligations to a defined Approved Source. Coal delivered pursuant to the agreement must be "mined" from the Approved Source, and Firestar, by signing the Confirmations, represented that it "owns, leases or has binding contractual supply commitments from and authority to sell the Coal from the Approved Source[.]" *See* DE 83-1 at 8. The 2022 Confirmation defined the Approved Source as "Seller's Tackett Creek mine delivered at the Resource Loadout located in Resource, KY with the CSX Origin number 44655[,]" *see id.* at 2, and the 2023 Confirmation defined the Approved Source as "Firestar Energy/Old House Mining delivered at the Resource Loadout located in Resource, KY on CSX rail line." *See* DE 83-2 at 2.

 As to interpretation, the parties diverge. WestRock contends that "Approved Source" refers, depending on context, to the listed mine *and* the resource loadout, owned and operated by a Firestar affiliate. *See* DE 85 at 18–19. Under that reading, coal sold to WestRock pursuant to the agreement must have originated from Tackett Creek mine for the 2022 Confirmation and Old House Mining from the 2023 Confirmation, then to be delivered to WestRock via Firestar's resource loadout to qualify as the Approved Source. Firestar, by contrast, reads "Approved Source" as referring *only* to its resource loadout, without reference to the originating mine. *See* DE 87 at 10–13.

Resolving the disagreement turns on contract interpretation principles. In Kentucky, an "unambiguous written contract must be strictly enforced according to the plain meaning of its express terms and without resorting to extrinsic evidence." *Blanton v. Wigginton*, No. 2021-CA-

1436-MR, 2023 WL 2335273, at *4 (Ky. Ct. App. Mar. 3, 2023). But where a contract is ambiguous or silent on a vital matter, a court may, in interpreting the contract, consult "parol and extrinsic evidence involving the circumstances surrounding the execution of the contract, the contract's subject matter, the objects to be accomplished, and the parties' conduct." *Id.* (citing *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 19 (Ky. 1953)). A contract is ambiguous when it is "capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981). Importantly, for summary judgment purposes, the determination of whether a contract is ambiguous is a matter of law for the Court, while areas of dispute concerning extrinsic evidence consulted in constructing the contract become fact issues subject to resolution by the factfinder. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974)).

The four corners of the 2022 and 2023 Confirmations resolve this interpretive dispute in WestRock's favor. The "Approved Source" unambiguously refers both to the listed mine and Firestar's Resource Loadout. Textual cues in the Confirmations and the associated Terms and Conditions compel this result. The first, and most obvious, support for this reading is the "Approved Source" definition's express inclusion of a listed, physical mine. *See* DE 83-1 at 2 (2022 Confirmation defining Approved Source as "Seller's Tackett Creek mine delivered at the Resource Loadout located in Resource, KY with the CSX Origin number 44655"); DE 83-2 at 2 (2023 Confirmation defining Approved Source as "Firestar Energy/Old House Mining delivered at the Resource Loadout located in Resource, KY on CSX rail line"). The included definition expressly hinges on both mine *and* loadout, and a contrary definition pays little respect to the complete text of the parties' agreement.

Implications flowing from the Section 9 warranties of the Terms and Conditions also indicate that the Approved Source must refer to something more than just the Loadout. *See City of Louisa v. Newland, Ky.*, 705 S.W.2d 916, 919 (1986) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible."). The Section 9 warranties provide, in relevant part, that "all Shipments under this Contract shall be mined from the Approved Source, unless a substitute Source is utilized in accordance with Section 2.0." *See* DE 83-1 at 8. The Loadout, indisputably, is itself not a mine, *see* DE 85-2 at 26, and it would be odd to require Firestar to "mine" coal for shipments under the contract from a place that cannot be mined. Further, an earlier warranty provides that the "Approved Source contains economically recoverable coal of a quality and in quantities that, under present mining laws and practices, shall be sufficient to satisfy the requirements of this Contract." *See id.* If the Approved Source were only the Loadout, then why would Firestar need to warrant that current mining laws and practices allowed for extraction of sufficient quantities of coal that had already been mined and transported to such Loadout? The more natural (and only reasonable) reading of Approved Source is that it includes the listed mine(s), and thus, Firestar warrants that the listed mine contains sufficient coal to fulfill the contract, while still abiding by present mining laws and practices.

Firestar cites, as a basis for a contrary reading, the Confirmations' "Delivery Point" definitions, which call for delivery "FOB Railcar at the Approved Source." *See* DE 83-1 at 2; DE 83-2 at 2. It argues this provision conflicts with the Section 9 warranties because "the Loadout was the only FOB delivery point under the Confirmations." *See* DE 87 at 11. However, that provision does little for Firestar because, even assuming that the only FOB delivery point was the Loadout, the Approved Source definition incorporates *both* the origin (the specific mine) and the FOB delivery point (the Loadout). While the only FOB delivery point was the Loadout, with delivery

to be considered complete upon loading and release of the trains to CSX, *see* DE 83-6 at 5, Firestar was to source the coal from "Seller's Tackett Creek mine *delivered* (emphasis added) at the Resource Loadout" for eventual delivery to WestRock by train. Firestar's preferred reading isolates the delivery point from its origin, while the Approved Source definition includes both.

Firestar finally argues that the parties' "actions and course of dealings also demonstrate their common understanding that the Approved Source was the Resource Loadout." *See* DE 87 at 11. But facing an unambiguous definition, these extrinsic sources are irrelevant. *See Cantrell*, 94 S.W.3d at 385 ("Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence.") (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)); *see also L.K. Comstock & Co. v. Becon Const. Co.*, 932 F. Supp. 948, 964 (E.D. Ky. 1994) ("When the express terms of the agreement leave no doubt as to the intent of the parties, the contract should be enforced in accordance with those terms in the absence of other defenses."). Accordingly, the Court disregards these improper considerations in discerning the meaning of this unambiguous provision.

While WestRock does not move for summary judgment on its substitute source counterclaim, which largely depends on this definitional holding, *see* DE 97 at 12, Firestar seeks summary judgment on all claims by WestRock "to excuse its breaches of [the] 2023 Confirmation based upon Firestar's alleged breach of warranty . . . ." *See* DE 88 at 1. That would include this issue. But summary judgment is not appropriate in Firestar's favor, as Firestar readily admits that it sourced coal from mines other than those listed as part of the "Approved Source" definition. *See* DE 83-6 at 9–10.  This dovetails with the materiality discussion later in this decision.

### ii. Section 9(i)–(ii) Alleged Breaches

The bulk of WestRock's partial summary judgment motion concerns the supply commitment warranties laid out in Sections 9(i)–(ii) of the Confirmations' Terms and Conditions (which applied in both 2022 and 2023). Under those provisions, Firestar represented that:

> (i) [it] owns, leases or has binding contractua1 supply commitments from and authority to sell the coal from the Approved Source; (ii) [it] shall continue to own, lease or have contractually committed to it the Approved Source during the term of this Contract[.]

DE 83-1 at 8 (also (iii), discussed later, again reflecting sufficient recoverable coal under contract).

WestRock asserts that Firestar materially breached these warranties through its lack of commitments and sourcing practices, and that as a result, WestRock is excused from its minimum tonnage purchase requirements under the 2023 Confirmation. *See* DE 85 at 12–17, 25.

Firestar responds that the Section 9 supply commitment warranties do not require a single commitment lasting the duration of the Confirmation, and that Old House Mining—the 2023 Approved Source mine—had, as the course of the facts showed, sufficient coal to fulfill the balance of the tonnage requirement specified in the 2023 Confirmation. *See* DE 87 at 13–16.

The Court finds that Firestar undoubtedly breached its Section 9(i) and (ii) warranties regarding coal supplies for use in fulfillment of the Confirmations. Having reviewed the full briefing and underlying record, it is plain and beyond genuine dispute that Firestar (which was not a mineral owner or leaseholder) had no binding commitments from the Approved Sources adequate to fulfill the Confirmations and substantiate the warranties. The spot and episodic transactions between Firestar and its suppliers undoubtedly did not represent compliant, enforceable underlying contracts. Further, Firestar had no relationship at all with stranger Tackett Creek. As to Old House, an oral or handshake relationship, fully terminable at will and not truly binding (that is, capable of legal enforcement despite an objection) under Kentucky law simply would not suffice to support a compliant warranty under any of the Section 9 representations. Firestar breached its

13

warranties when it failed to ensure an adequate supply under its binding, contractual control. As for duration, the Confirmation "Term," the defined period set forth in the respective Confirmation, meant that the supply commitment had to exist for the duration of, "during the term of," each Confirmation.[3] This extended the obligation for the full balance of the Confirmations. At no time—not at entry and not later, during the fullness of the Term, was Firestar in a position that complied with its representations regarding supply commitments.

However, summary judgment for WestRock still cannot lie. A genuine dispute of fact exists as to whether the breaches were material, thereby excusing WestRock's continued performance[4] and potentially ripening a remedy for WestRock. On this record, materiality is a fact question. Importantly, WestRock primarily argues that Firestar's warranty breach excused WestRock from fulfilling the minimum tonnage purchase requirements under the 2023 Confirmation. *See* DE 85 at 26. True, as Firestar largely concedes, a "party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party." *See Fay E. Sams Money Purchase Pension Plan v. Jansen*, 3 S.W.3d 753, 759 (Ky. Ct. App. 1999). That does not apply to just any breach, though—the first party's breach must have been "substantial or material," *see Payne v. Rutledge*, 391 S.W.3d 875, 880 (Ky. Ct. App. 2013), and the non-breaching party may not escape their obligations only for a "slight or inconsequential" breach. *See Fay E. Sams Money Purchase Pension Plan*, 3 S.W.3d at 757; *see also Pace v. Burke*, 150 S.W.3d 62, 66 (Ky. Ct. App. 2004) ("[A]s a general rule, one party's total failure to perform his obligations under a contract justifies the non-breaching party in treating the contract as

---

[3] After all, the warranty in (ii) is that commitments would "continue" during the term, inarguably supporting the reading that during would mean the full term's duration.
[4] The same issue would apply to operation of Section 4.0(b)(ii) and its nonperformance excuse.

abandoned and suspending his own performance[.]") (citing *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956)).

A breach is material where it "goes to the essence of the contract" or is "vital" to the contract's existence. *See Self–Made, LLC v. SKPR KY–2, LLC*, No. 2014-CA-000741-MR, 2015 WL 6778688, at *2 (Ky. Ct. App. Nov. 6, 2015) (citing 23 Williston on Contracts § 63:3 (4th ed.)). And, integral to this summary judgment posture, Kentucky courts, and the Sixth Circuit, consider the question of whether a breach is material to be a question of fact, typically for resolution by the factfinder. *See Hodak v. Madison Cap. Mgmt.*, LLC, 348 F. App'x 83, 90 (6th Cir. 2009) ("The determination whether a material breach has occurred is generally a question of fact answered by weighing the consequences of the breach in light of the customs of performance attendant to similar contracts."); *Mirco Indus., Inc. v. Clark Leasing, Inc.*, 129 F.3d 1264 (table), at *4 (6th Cir. 1997) ("Generally, whether a breach is material is a question of fact to be decided by the trier of fact.") (citing *Campbell v. Hulett*, 243 S.W.2d 608, 611 (Ky. Ct. App. 1951)); *U.S. for Use & Benefit of Ken's Carpets Unlimited, Inc. v. Interstate Landscaping Co.*, 37 F.3d 1500 (table), at *7 (6th Cir. 1994) ("Materiality then is a question to be determined by examining the circumstances of the particular case, and thus is normally a question for the trier of fact.").

The parties dispute the materiality of the Section 9 warranties and the importance of any noncompliance. WestRock urges materiality because "[t]he language of Section 9.0 gave WestRock the assurance that its supplier would be able to provide an uninterrupted supply of coal regardless of what unanticipated (or even unlikely) changes might occur in the market." *See* DE 85 at 18. Essentially, WestRock argues, it paid for an "insurance policy" against energy price and supply volatility, secured by the Section 9 warranties, that it never received. *See id.* For its part, Firestar argues that its alleged breaches were, "at most, technical breaches that were not material

15

and had no economic or any other impact upon WestRock, whatsoever." *See* DE 87 at 1. It continues that WestRock's delayed, indeed opportunistic, interest in coal origin and the uninterrupted source of supply ultimately provided to WestRock creates fact issues as to whether the Section 9 warranties constitute material terms. The market volatility and fluctuations, with peaks during 2022 and a cratering in 2023, provide useful background.

Several features of the record create fact issues precluding summary judgment. First, the record demonstrates that WestRock was, at points, readily aware of, and even requested, that Firestar source coal from mines other than those listed in the Approved Source. *See* DE 88-16 at 8–10; *see also* DE 88-4 at 5 (Tim Jones Declaration explaining that Firestar blended coal to "address a non-specific, coal handling issue raised by WestRock"). Yet, WestRock did not raise coal sourcing as an issue until July 2023, after accepting the blended coal for around five months under the latter Confirmation. *See* DE 88-4 at 3. It then accepted five more deliveries between August 2023 and mid-October 2023 *after* raising the sourcing issue. *See* DE 88-4 at 3, 4 ("WestRock agreed to accept Fossil Coal as a substitute for the Old House Mining coal in September 2023."). If the Section 9 warranties were as material as WestRock now makes them out to be, plausibly, it would or could have balked at Firestar's fulfillment approach well before it did. That the issue only arose once Firestar sought damages raises a fact-based inference, fit for the factfinder to assess, that Firestar's intent to seek damages served as the chief impetus for raising alleged Section 9 breaches.

Further, Firestar's pretext argument raises another factual issue bearing on materiality. While WestRock alleges that Firestar's Section 9 breaches prompted it to begin refusing coal deliveries, Firestar presents a different—more opportunistic—theory:

> The parties executed their 2023 Confirmation in August 2022, when energy prices were at record highs and the market price for Eastern Kentucky coal (which price was

agreed by the parties for the full 2023 term) was $175 per ton. Shortly thereafter, energy prices precipitously dropped, such that the market price for this coal declined to $75 and lower in early 2023, and prices remained at lower levels for the balance of 2023. Because market prices fell significantly, the contract price under the 2023 Confirmation was well above the market price at the time of the scheduled deliveries. Perhaps more significantly, natural gas prices also drastically declined in 2023, such that WestRock was able to purchase natural gas on the open market at one-quarter of the price per MMBtu that it was obligated to pay for Firestar's coal. It was in response to this price move that WestRock stopped taking Firestar's coal and began burning natural gas in its place.

DE 87 at 2. Thus, the theory goes, WestRock didn't *really* consider Firestar's alleged Section 9 breaches to be material; it merely made economic decisions on the use of coal and then determined, when pressed, to use the warranty issues to avoid accountability under the 2023 Confirmation.

This theory finds some support in the record. First, Firestar tenders an expert report assessing coal and natural gas price conditions during the relevant period. *See* DE 87-2. The report concludes that coal and natural gas prices spiked in Spring 2022 and remained high for the remainder of the year. *See id.* at 4–5. A warm winter then led to a reduction in demand for natural gas—with an associated price decrease—just around the time WestRock stopped accepting coal and began, as an alternative, burning natural gas at the Covington mill. *See id.* Further, Firestar offers evidence suggesting that when contracting with third-party brokers (like Firestar) for coal supply from a specific mine, WestRock traditionally procured a separate confirmation directly from the mine assuring sufficient coal supply. *See* DE 87-12 at 13–14 (Deposition of Mike Kuhn, WestRock's Director of Global Energy, confirming that when dealing with a different third-party supplier, WestRock received supply commitment confirmation from the mine itself). WestRock never separately confirmed supply access with Old House for the 2023 Confirmation, *see id.* at 15, further suggesting that WestRock was interested more generally in coal supply at the committed tonnage price from Firestar than it was in supply from any specific mine. The timing mechanics— with WestRock raising Section 9 as an excusal basis after significant performance of the 2023

17

Confirmation, after Firestar's notification of a damages claim, and with knowledge that Firestar supplied coal from sources other than the listed mine for both the 2022 and 2023 contracts—also arguably support this theory. *See* DE 87-7 at 7 (Deposition of WestRock Energy Contract Administrator, JiNia Clanton, confirming that she was aware during the 2022 Confirmation that Firestar supplied coal from other than the Approved Source); *See* DE 88-16 at 8 (Deposition of Dwayne Jones explaining that he notified Hensley in late 2022 that Firestar would blend Ridgeline and Fossil coal with Old House to meet requested specifications).

All that to say, WestRock's (in one plausible view) long-held indifference to Firestar's sourcing practices, juxtaposed with its sudden invocation of the Section 9 warranties at a time when market forces favored coal over gas, raises the specter of pretext and contributes to create a genuine dispute as to whether the breaches were material. That determination must lie with the factfinder. *See Hodak*, 348 F. App'x at 91 (reversing summary judgment where the defendant argued material breach but presented no evidence "to support the finding that the breaches were material enough to" motivate the party's own breach and in "the face of evidence from its own representatives that other reasons actually motivated" its nonperformance).[5]

And, a few last points on materiality.  That analysis, under Restatement (Second) of Contracts § 241, requires, e.g., consideration of injury, the degree of deprived benefit, the risk of

---

[5] In precluding summary judgment in WestRock's favor on its breach of contract claims, this holding simultaneously precludes summary judgment on its declaratory judgment recission claim and its request that the Court declare that Firestar's breach excuses any claim against WestRock for damages. Recission certainly depends on a material breach, which the Court now holds is subject to a genuine dispute. *See Evergreen Land Co. v. Gatti*, 554 S.W.2d 862, 865 (Ky. Ct. App. 1977) ("It is elementary that a contract may not be rescinded unless the non-performance, misrepresentation or breach is substantial or material. The court does not look lightly at rescission, and rescission will not be permitted for a slight or inconsequential breach."). And, as the cases clearly indicate, WestRock would only be excused from damages based on Firestar's failure to perform if the failure was material to the contract—an issue imbued with factual nuances (i.e., consideration of the § 241 factors on a full record) inappropriate for summary judgment.

forfeiture, and the good faith and fair dealing of the defaulting party. *See Bluegrass Equine & Tourism Found. v. Kentucky*, 2013 WL 1919567, at *16 (Ky. Ct. App. 2013). Here, the Confirmations undoubtedly required the warranties, and Firestar undoubtedly did not make accurate representations relative to the binding commitments. However, WestRock did not suffer the specific harms that seemingly motivated the warranties, e.g., lack of supply attributable to market risk. Really, the opposite eventuality ensued, with a tanking market and excess supply. The Court does not view the matter as either material *or* immaterial as a matter of law. The warranties plainly had primacy when the Confirmations came into being. How to view the situation in 2023, after significant performance[6] and when the relationship collapsed, will take development and thought at trial, as well as consideration of all § 241 values. The Court finds the record inadequate to support a full exposition on materiality and that a genuine dispute of material fact exists from the perspective of each party.

### iii.  Section 9(iii) Alleged Breach

Finally on breach, WestRock alleges that Firestar defaulted on its Section 9(iii) warranty that the Approved Source "contains economically recoverable coal of a quality and in quantities that, under present mining laws and practices, shall be sufficient to satisfy the requirements of this Contract . . . ." *See* DE 82-1 at 8. It argues that because Firestar admitted to blending different types of coal to meet quality specifications, the "Approved Sources" under the 2022 and 2023 agreements "did not, in and of themselves, meet the coal-quality specifications set forth in each

---

[6] This history includes the prior known blending, the WestRock documents indicative of noncompliant source awareness, the contractual duty not to withhold Substitute Coal approval unreasonably, and the apparent Specifications compliance in the actual commodity supplied. Although WestRock perhaps faced risks from Firestar's warranty defaults, it is not clear that such defaults actually caused WestRock harm. That said, Firestar, by breaching, did introduce very different economic dynamics into the mix, and those, which were counter to WestRock's reasonable expectations, surely may have an ultimate impact on the way the contractual duties, and any potential associated remedies, play out.

Confirmation and warranted by Firestar in Section 9.0(iii); or [] were not available in sufficient quantities to meet the Confirmation requirements." *See* DE 85 at 25.

WestRock is not entitled to summary judgment on this issue. It relies solely on the fact that Firestar blended coal during the 2023 Confirmation period, essentially surmising that insufficient coal supplies motivated the move. However, it doesn't point to any concrete evidence suggesting that was the case. And some evidence contradicts it. Tim Jones's declaration explains that Old House agreed to fulfill all of Firestar's 2023 needs at $80 per ton, with the price to be evaluated periodically during the 2023 term. *See* DE 88-4 at 4–5. Nothing suggests Old House ever fell short of that commitment. *See id.* ("Firestar reasonably relied on this commitment, despite the absence of a writing, as Old House Mining had more than enough reserves to fulfill the 2023 Confirmation, as Firestar was Old House Mining's only customer, and as Old House and its affiliates had historically and consistently honored such verbal commitments and supplied Firestar with all the coal it ordered[.]"). Jones's declaration also explains that Firestar blended coal, not for shortage issues, but to "address a non-specification, coal handling issue raised by WestRock." *See id.* at 5. Dwayne Jones's deposition testimony, which explained that WestRock requested the coal blending, adds credibility to this view. *See* DE 88-16 at 9–10.

In sum, WestRock's Section 9(iii) breach argument relies largely on unsupported inferences, contradicted in some respects by record evidence. That (as again would materiality) creates a genuine factual dispute precluding summary judgment.[7]

---

[7] The Court has considered the UCC § 2-708 argument and Firestar's functional broker status. The consideration of any remedy must await the materiality determination, but the Court has concern about the windfall position advocated by Firestar. Because of its noncompliance and the market's undulations, Firestar seeks a contract remedy that rewards it for the market drop during the 2023 Confirmation. Of course, had Firestar not breached, it would have had binding supply agreements from August 2022 that, one presumes, would have been well north of the '23 market nadir. Whether WestRock remains on the hook for the 2023 Contract Quantity remains an open question, but the Court will look hard at the proper

### b. Firestar's Motions for Summary Judgment

Firestar separately moves for summary judgment in its favor on Counts IV, V, and VII of WestRock's second amended counterclaim. *See* DE 106. In doing so, it seeks a ruling that "WestRock has not met the conditions for suspending or terminating performance and cannot avoid its obligations to pay damages for its economically motivated decision to fail to take Firestar's coal[,]" and a ruling that Kentucky's economic loss rule bars WestRock's fraud in the inducement claims. *See id.* at 4–5. The Court takes each in turn.

### i. Waiver of Termination Remedy

Firestar first argues that WestRock waived its sole termination remedy under the Confirmation's Terms and Conditions and cannot now claim recission or excusal of its minimum tonnage purchase requirements. *See* DE 106 at 5–9.

Firestar's waiver argument is convoluted. But the Court perceives it to go something like this: Section 4 of the Confirmation establishes a damages formula in the event a party fails to either deliver or accept enough coal, as prescribed by the Confirmation. *See* DE 83-1 at 5. However, the remedy may be excused, as binding to WestRock, by "Force Majeure or Seller's failure to perform[.]" *See id.* at 6. Later, Section 9.1 of the Terms and Conditions establishes certain "Events of Default," assigns remedies for the listed events of default, then specifies that the parties waive all other remedies for the enumerated default events. *See id.* at 8–10. The "Events of Default" include a "Failure to Perform," which, in situ, consists of the defaulting party having "failed to deliver or receive . . . any two or more Shipments during the term of the Contract[.]" *See id.* at 9. And, as a remedy for that default, a party may suspend performance, for no longer than 15 days, and/or establish an early termination date. *See id.* So, Firestar argues, because it never failed to

_____

remedy if Firestar earns such remedy and yet inflated its potential damages by engaging in noncompliant conduction.

perform under Section 9.1, and because Section 9.1 limits remedies to those expressly listed in that section, WestRock cannot rely on Section 4's excusal language as a basis for avoiding damages.

As with any contractual interpretation effort, the Court must examine the "plain language of the instrument," *Salyersville Nat'l Bank v. Russell*, 629 S.W.3d 820, 825 (Ky. Ct. App. 2021), while endeavoring to "giv[e] effect to all parts and every word in it if possible." *Cantrell Supply*, 94 S.W.3d at 384–85.

Firestar's reading fails on the plain language of the contracts in at least three ways. First, there is no indication that Sections 4 and 9 relate to one another, and certainly not in cross-limiting ways. Indeed, the Confirmation expressly views them as separate. *See id.* at 5 ("The remedies set forth in (a) and (b) below *and* in Section 9.l(vii) shall be the exclusive remedies for a Party's failure to deliver or receive Coal as set forth in this Contract.") (emphasis added). Both Section 4 and Section 9.1 include remedies, and the remedies listed in *both* provisions "shall be the exclusive remedies for a Party's failure to deliver or receive Coal." *See id.* Limiting Section 4's effect by way of Section 9.1's remedial exclusivity, as Firestar attempts to do, flies in the face of this provision, which expressly contemplates two distinct remedial schemes.

Firestar's attempt to link Section 4's reference to "Seller's failure to perform" to Section 9.1's "Failure to Perform" default event is also unavailing. The Confirmation routinely utilizes capitalization when referring to a defined term. *See, e.g.*, DE 83-1 at 8 ("[A]ll Shipments under this Contract shall be mined from the Approved Source, unless a Substitute Source is utilized in accordance with Section 2.0"). But when referencing "failure to perform" in Section 4, the Confirmation leaves the phrase lowercase, and the many enumerated definitions, from the Terms and Conditions, do not include a "failure to perform" definition. *See id.* at 12–14. Under Firestar's reading, Section 9.1 defines the one and only way in which a party could be excused from damages

for a Section 4 "failure to perform." However, the theory ignores that, as referenced above, the Confirmation views the two subsections as distinct. And it similarly ignores that the Confirmation does not expressly define "failure to perform" as it does for so many other phrases of consequence. The more reasonable reading, then, is that Section 4 refers to general failures to perform, while Section 9.1's failure to perform default event refers to a specific way in which a party might fall short of its obligations, giving rise to a specific remedy.

The remedies associated with Section 4 and Section 9.1 also confirm that the concepts differ. Section 4's failure to perform "excuses" a party from the damages formula established for a failure to deliver or receive the "Contract Quantity for the Term," whereas Section 9.1's specific instance of nonperformance addresses short-term noncompliance and potentially gives rise to a mid-Term suspension or termination remedy. *See* DE 83-1 at 5, 9. Section 4 thus provides an avenue applicable to Coal receipt for the Term, while Section 9.1 addresses a specific breach, during the Term, that may yield a remedy at that stage.

Finally, the Section 9.1(f) remedial limitation expressly preserves operation of Section 4.0(b). To quote the all-caps phrasing: "DAMAGES FOR THE FAILURE TO DELIVER OR RECEIVE TONS ARE SUBJECT TO THE LIMITATIONS SET FORTH IN SECTION 4.0(b)." One of those limitations is the very conditional introduction at issue—"[u]nless excused by. . . Seller's failure to perform[.]"  The Court sees no contractual basis for engrafting the Section 9 concepts onto the Section 4 remedy.

Accordingly, the Court rejects Firestar's assertion that the Confirmation terms now bar WestRock from arguing its positions relative to the 2023 Confirmation.

### c. Fraud in the Inducement

#### i. 2023 Claim

Firestar moves for summary judgment on WestRock's fraud in the inducement claims, in relevant part, because the economic loss doctrine bars such fraud claims in this breach of contract case. *See* DE 106 at 11–16.

The economic loss doctrine prohibits recovery of tort damages in a case turning on a breach of contract by "'requiring a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" *Nami Res. Co., L.L.C. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 335 (Ky. 2018) (quoting *Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc.*, 868 F.Supp.2d 983, 991–92 (E.D. Cal. 2012)). The "rule recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code." *Biszantz v. Stephens Thoroughbreds, LLC*, No. 5:13-CV-348-REW, 2015 WL 574594, at *12 (E.D. Ky. Feb. 11, 2015), *aff'd sub nom. Biszantz v. Stephens Thoroughbreds*, 620 F. App'x 535 (6th Cir. 2015). As such, courts have applied the economic loss rule to bar fraud claims where "the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract," *Nami*, 554 S.W.3d at 335, and where the fraud claim is "indistinguishable" from the breach of contract. *See New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 414–15 (6th Cir. 2022).

The economic loss doctrine bars WestRock's fraudulent inducement claim as to the 2023 Confirmation. To start, the fraud claim is "fundamentally interwoven with the breach of contract claim." *Biszantz*, 2015 WL 574594, at *13. WestRock's supporting factual basis for the two claims is essentially identical—namely, that Firestar lacked, at the outset and throughout performance,

the binding contractual commitments it warranted by executing the 2023 Confirmation. *Compare* DE 45 at 27 (Breach of Contract Counterclaim alleging that Firestar breached the 2023 Confirmation by "materially misrepresenting the source of the coal scheduled by, delivered to, invoiced and paid for by WestRock"), *with id.* at 31 (Fraud in the Inducement Counterclaim alleging that Firestar fraudulently induced WestRock by falsely representing that it had "binding contractual supply commitment with a mine to acquire all of the coal required under the 2023 Confirmation from the Approved Source"). There's little daylight between those theories. Under the first, WestRock breached its contractual agreements by falsely representing that it maintained binding upstream supply commitments for the 2023 Confirmation coal; under the second, it fraudulently induced WestRock into entering into the Confirmation by doing the same. The fraud basis is "indistinguishable from the breach of contract claim," and so WestRock cannot recover under this secondary, tort-based theory. *New London*, 44 F.4th at 414; *see also Nami*, 554 S.W.3d at 336 ("[T]he conduct [WestRock] asserts supports that the fraud claim is indistinguishable from the breach of contract claim.").

Confirming the point, WestRock's sought relief goes nowhere "above and beyond" a broken contractual promise. *See id.* In addition to damages, it seeks, for breach of contract, to terminate the 2023 Confirmation due to Firestar's material breach, *see* DE 45 at 28, and, as to the fraudulent inducement claim, it seeks a declaration that the "2023 Confirmation is rescinded and *void ab initio.*" *Id.* at 32. Those nearly identical grounds for relief arise from Firestar's apparent contractual duties to WestRock, not some duty arising "independently" from the parties' contractual agreement. *See Nami*, 554 S.W.3d at 336 (quoting *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 792 (Ky. 2017)). That the parties' interactions were "exclusively contractual," and, but for the contract, the parties "would not have a relationship"

25

definitively shows, on this record, that the duties allegedly breached arise from contract. *See Biszantz*, 2015 WL 574594, at *13.

WestRock counters that it may plead both breach of contract and fraudulent inducement, so long as it does not recover on both theories. In support, it cites *New London* for the proposition that a defendant may "*plead* both a fraudulent inducement claim and a breach of contract claim," but it "may not *recover* upon both claims." *See New London*, 44 F.4th at 413. But the *New London* court made that statement in the context of choice-of-remedies discussion, not an economic loss doctrine explication. *See id.* at 413. The Court was simply stating the well-worn remedies doctrine that a litigant may bring a fraudulent inducement and breach of contract claim, so long as it does not recover under both. However, it separately noted that the economic loss doctrine, distinct and apart from any choice of remedies issues, prohibits recovery where the "fraud claim is indistinguishable from the breach of contract claim." *See id.* at 414 (citing *Nami*, 554 S.W.3d at 336). This is the crux of the Court's current holding—that WestRock's fraud claim touches the exact issues girding the redress sought by breach of contract. Here, the economic loss doctrine controls.[8]

Accordingly, the Court **GRANTS** summary judgment in favor of Firestar as to Count IV of WestRock's second amended counterclaim, DE 45.

---

[8] WestRock makes an ancillary argument that the cases Firestar cites, and now some of the cases the Court relies on in granting summary judgment on the 2023 fraud claim, rely on fraud in the inducement "as to a future intended contract performance" as compared to fraud in the inducement "as to a present fact." *See* DE 107 at 23–27. As far as the Court can tell, Kentucky courts do not distinguish those concepts in this context, and WestRock does not point the Court to any such distinction. In any event, assuming that Firestar did misrepresent a present fact rather than its future intent to perform under the contract, the misrepresentations arose from the contract that WestRock alleges Firestar breached. *New London* plainly applied the doctrine in the inducement context, where, as here, the claim focused on matters not extraneous to the contract. *See New London*, 44 F.4th at 415-16.

### ii.  2022 Claim

Firestar also moves for summary judgment on WestRock's fraud claim arising out of the 2022 Confirmation. WestRock's 2022 claim, similar to its 2023 claim, alleges that Firestar represented that it had "contractual commitments to supply from the Tackett Creek mine and that the Tackett Creek mine had coal in sufficient quantity and quality to meet the 2022 Confirmation's requirements" but that "Firestar has admitted that it failed to supply any coal from the Tackett Mine . . . to WestRock under that 2022 Confirmation." *See* DE 45 at 36.

The analysis governing WestRock's 2023 claim compels summary judgment in Firestar's favor on this claim as well. Just as before, the relief sought arises directly from the breach of a contractual commitment between the parties. WestRock alleges that Firestar fraudulently induced it to enter into the 2022 Confirmation by representing that it secured binding upstream supply commitments with Tackett Creek mine when, in reality, it had no such agreements. But, still the same, the representation arises from the contractual agreement itself and could just as easily serve as a basis for a breach of contract claim. The economic loss doctrine prevents that result, for a dispute centered only in contract.[9]

In contrast to its 2023 Confirmation claims, WestRock does not bring a 2022 breach of contract claim. But that pleading decision does not jeopardize applicability of the economic loss

---

[9] The Kentucky Supreme Court does not appear to have addressed application of the economic loss doctrine in the absence of an associated breach of contract claim. So, the Court's current holding is in some sense predictive. *See Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir. 2019) (explaining that federal courts sitting in diversity must "predict" how state's highest court would rule, using "all the available data," including "decisional law of the state's lower courts"). However, the prediction here is an easy one. The Kentucky Supreme Court has routinely postured the economic loss doctrine as a demarcation of the boundaries between contract and tort law, ensuring that one does not overcome the other. *See Nami*, 554 S.W.3d at 335; *Superior Steel*, 540 S.W.3d at 792; *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 739 (Ky. 2011). The Court sees not how that rationale applies any differently depending on whether a party expressly asserts a breach of contract claim, so long as the damages sought and remedies relied on arise from contract and implicate contract-type damages. So, the Court has little difficulty, in light of the Kentucky Supreme Court's economic loss doctrine holdings, concluding that it would hold that the doctrine applies in this setting.

doctrine. Indeed, nothing in the cases suggests that a breach of contract claim must be included alongside a fraud claim for the doctrine to apply. Rather, the determinative question is whether the damages or relief sought arise out of the duties included in or derived from the parties' contractual agreement. *See New London*, 44 F.4th at 414 (explaining that the economic loss doctrine requires a party to "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise") Here, they certainly do. As before, the crux of WestRock's claim is that Firestar fraudulently induced it to enter into the 2022 Confirmation by way of faulty supply commitment representations with Tackett Creek. *See* DE 45 at 36 ("Despite these representations and express warranties . . . Firestar has admitted that it failed to supply any coal from the Tackett Mine . . . to WestRock under that 2022 Confirmation."). But the duty to properly represent Firestar's upstream supply arose from the 2022 Confirmation, and as the Kentucky Supreme Court has clearly explained, "[a] breach of duty which arises under the provisions of a contract between the parties must be addressed under contract, and *a tort action will not lie*." *Nami*, 554 S.W.3d at 336 (citing *Superior Steel*, 540 S.W.3d at 792) (emphasis added).

Here as well, the damages sought for the purported fraud reflect a theory consistent with contract. For the 2022 fraud claim, WestRock seeks "approximately $4,500,000, representing the difference between the $127.50/$122.50 per ton prices in the 2022 Confirmation and the $85.00 per ton price that WestRock had been paying under its arrangements prior to being induced into entering the 2022 Confirmation[.]" DE 45 at 37. In essence, that's the amount needed, on this theory, to return WestRock to its position pre-breach. *See Adams v. Brenton*, No. CV 5:17-251-KKC, 2018 WL 5986735, at *1 (E.D. Ky. Nov. 13, 2018) ("It is well established in this jurisdiction that the measure of damages for breach of contract is that sum which will put the injured party into

28

the same position he would have been in had the contract been performed."). However dubious the Court might be on the theoretical application, this is not seeking damages outside of a contractual structure.

This is right in line with what the economic loss doctrine prevents—using the law of torts to enforce rights and remedies cognizable in contract. *See Nami*, 554 S.W.3d at 336 (economic loss doctrine bars torts claims where "a plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim"); *Highland Stud Int'l v. Baffert*, No. 00-cv-261-JMH, 2002 WL 34403141, at *3 (E.D. Ky. May 16, 2002) ("The economic loss rule bars recovery in tort for economic loss. The [] rule marks the border between tort and contract law.") (quoting *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845. 848 (6th Cir. 2002)). And dismissing the claim as a matter of law, despite the absence of a breach claim, comports with the economic loss doctrine's motivating rationale: to prevent "the law of contract and the law of torts [from] dissolv[ing] one into the other." *New London*, 44 F.4th at 414. That risk is no less apt simply because a party did not plead a breach of contract claim. To the contrary, it's why the fundamental cases call on courts to consult the nature of the remedies sought and the source of the rights relied on to determine whether the doctrine applies. *See Superior Steel*, 540 S.W.3d at 792 ("[T]he question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty the plaintiff claims the defendant owed. A breach of duty which arises under the provisions of a contract between the parties must be addressed under contract, and a tort action will not lie.") (quoting *Presnell Constr. Managers, Inc. v. EH Constr.*, 134 S.W.3d 575, 583–84 (Ky. 2004)).

Both right and remedy sound in contract here, and dismissing the claim as a matter of law prevents, in line with the doctrine, an end-run around the law of contract by way of a tort claim.[10]

The Court **GRANTS** summary judgment in Firestar's favor on Count VII of WestRock's counterclaim, DE 45.[11]

### d. Unjust Enrichment

Finally, Firestar moves for summary judgment on WestRock's unjust enrichment claim. *See* DE 106 at 9–10. Under that claim, WestRock alleges that Firestar "scheduled, delivered, invoiced, and collected payment on deliveries of coal to WestRock from non-approved sources on each train scheduled and/or delivered in 2023," and that, as a result, "Firestar has been unjustly enriched at the expense of WestRock, to the extent that WestRock paid more for coal from non-

---

[10] The parties also argue the effect of the duress allegation WestRock includes in Count VII. *See* DE 45 at 36 ("WestRock was coerced to enter the 2022 Confirmation under duress by Firestar's threats to terminate supply of coal to WestRock unless it agreed to the nearly $40.00 per ton increase that Firestar extracted through the 2022 Confirmation."). The Court does not perceive the allegation to have any effect on the preceding analysis. As WestRock itself notes, duress is neither an independent counterclaim, nor a required element for fraud in the inducement under Kentucky law, *see* DE 107 at 24, so it's unclear what precise effect the allegation has on the claim basis. As best the Court can tell, WestRock uses the duress allegation to further the "made with inducement to be acted upon" element of fraud in the inducement. *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) ("In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."). That being the case, Firestar allegedly represented active, binding upstream supplying commitments, while allegedly threatening to renege on its Coal Supply agreement as a means of procuring WestRock's inducement. But, as the Court now holds, the fraud claim is incognizable under the economic loss doctrine in this contract case, so the underlying allegations do not substantively affect the analysis.

[11] WestRock added this claim as part of its second amended counterclaim after the Court granted leave for WestRock to amend its counterclaim out of time. *See* DE 45; 99. Firestar has yet to formally answer the allegations laid out in Count VII but has since filed a motion for leave to answer out of time, alleging mistake in its failure to answer. *See* DE 109. However, because the Court now dismisses Count VII as a matter of law, Firestar has no need to formally answer the allegations, and the Court now **DENIES** DE 109 as moot. WestRock argues that the Court should deem the allegations Firestar has not answered as admitted under Fed. R. Civ. P. 8(b)(6). But because the economic loss doctrine bars the claim as a matter of law in this case, Firestar's factual denials or affirmances play no part in the analysis. Accordingly, a formal answer is unnecessary and a mootness denial prevails. The Court also would not preclude an answer, on this record, and in this fully contested matter.

approved sources than it would have paid had it purchased that same coal on the open market." *See* DE 45 at 33.

A Kentucky unjust enrichment claim requires a party to show "(1) a benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value." *Furlong Dev. Co. v. Georgetown-Scott Cty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016). Unjust enrichment is a legal fiction created to permit recovery where contract does not provide for it, but equity fairly calls for compensation for a conferred benefit. *See Perkins v. Daugherty,* 722 S.W.2d 907, 909 (Ky. Ct. App. 1987). However, because "unjust enrichment is rooted in equity and 'law trumps equity[,]' courts frequently note that 'unjust enrichment is unavailable when the terms of an express contract control.'" *Superior Steel*, 540 S.W.3d at 778; *Furlong Dev. Co., LLC*, 504 S.W.3d at 40 (same); *Shane v. Bunzl Distribution USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) ("Under Kentucky law, '[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.'") (quoting *Codell Constr. Co. v. Kentucky*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977)); *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 773 (E.D. Ky. 2019) ("Since a claim for unjust enrichment or implied contract cannot lie under Kentucky law where a written contract references the same subject matter, this theory of recovery is barred by law. As a matter of law, therefore, Plaintiffs' allegations fail . . . .") (internal quotations and citations omitted).

Firestar argues that the Court must grant summary judgment in its favor on WestRock's unjust enrichment claim because the terms of a contract control this transaction. That is the correct reading of these cases. The parties do not dispute the existence of a binding contract. Indeed, the thrust of WestRock's counterclaims is that Firestar failed to live up to its end of the contractual

bargain. In that setting, the rights and remedies established by contract control, and unjust enrichment—a remedy in equity only—has no application.

While some cases would allow a party to maintain an unjust enrichment claim alongside a breach of contract claim, where one party renders performance and the other party renders none, *see, e.g.*, *Brock v. Pilot Corp.*, 234 S.W.3d 381, 384 (Ky. Ct. App. 2007), that is not the present circumstance. Both parties rendered some amount of performance as to the 2023 Confirmation, with Firestar delivering and WestRock purchasing some 100,000+ tons of coal. One or both parties may have breached as to the balance of the contractual obligations, but nonetheless, some part of the contract was performed. That distances this case from cases like *Brock*, and it renders an unjust enrichment claim unapplicable.

WestRock does not seem to substantively disagree with this finding. *See* DE 107 at 16–17. It recognizes that the claim "would be applicable only if the Court rescinds and/or voids the 2023 Confirmation" under Count IV of the party's counterclaim. *See id.* So, it insists, it can plead the claim in the alternative to its breach of contract claims and pursue it in the event the Court rescinds the contract. *See id.* at 16. But the Court has now held that Firestar's 2023 fraud claim is indistinguishable from its breach of contract claims, barring the claim as a matter of law. So, as WestRock seems to recognize, this dependent and alternative claim must also fall.

Accordingly, the Court **GRANTS** summary judgment in favor of Firestar on Count V of WestRock's second amended counterclaim, DE 45.

## IV.    Conclusion

The Court sees a trial as necessary.  Both sides feature instances of inconsistency and a plain degree of self-centered economic opportunism.  The Court will, through trial and the terms of the Confirmations, sort out the parties' contractual responsibilities and any remedies due.

Consistent with the above analysis, the Court **ORDERS** as follows:

1. The Court **DENIES** DE 83 and 85, WestRock's motion for partial summary judgment;

2. The Court **DENIES in part** DE 86, Firestar's partial and cross motion for summary judgment, insofar as it seeks summary judgment on claims other than Counts IV, V, and VII of WestRock's Second Amended Counterclaim;

3. The Court **GRANTS in part** DE 86, Firestar's partial and cross motion for summary judgment, insofar as it seeks summary judgment in Firestar's favor as to Counts IV, V, and VII of WestRock's Second Amended Counterclaim;

4. The Court **GRANTS in part** DE 106, Firestar's second motion for summary judgment, insofar as it seeks summary judgment in Firestar's favor as to Counts IV, V, and VII of WestRock's Second Amended Counterclaim;

5. All other counts of Firestar's Amended Complaint and WestRock's Second Amended Counterclaim remain active and await trial; and

6. The Court **DENIES as moot** DE 109.

7. The Court will, by separate order, initiate the process for scheduling trial.

This the 12th day of September, 2025.



Signed By:

**_Robert E. Wier_**

**United States District Judge**